MIED ProSe 1 (Rev 5/16)  Complaint for a Civil Case

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

KEVIN WILLIAM CASSADAY - PRO PER

*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

**v.**

STATE OF MICHIGAN, et al

*(Write the full name of each defendant who is being sued.  If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

Case: 1:25-cv-12576
Judge: Ludington, Thomas L.
MJ: Morris, Patricia T.
Filed: 08-18-2025
CMP KEVIN WILLIAM CASSADAY V.
STATE OF MICHIGAN, ET AL (tt)

Jury Trial:  ☑ Yes  ☐ No
*(check one)*

# Complaint for a Civil Case

MIED ProSe 1 (Rev 5/16)  Complaint for a Civil Case

---

## I.     The Parties to This Complaint

### A.      The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | KEVIN WILLIAM CASSADAY |
| Street Address | 4819 N. STARK RD. |
| City and County | HOPE, MIDLAND COUNTY |
| State and Zip Code | MI, 48628 |
| Telephone Number | 989-615-7096 |
| E-mail Address | kwcassaday@yahoo.com |

### B.      The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known).  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | STATE OF MICHIGAN |
| Job or Title (if known) | GOVERNOR GRETCHEN WHITMER |
| Street Address | PO BOX 30013 |
| City and County | LANSING, INGHAM COUNTY |
| State and Zip Code | MI, 48909 |
| Telephone Number | |
| E-mail Address (if known) | |

Defendant No. 2

| | |
|---|---|
| Name | SEE ATTACHED PLEASE |
| Job or Title (if known) | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address (if known) | |

MIED ProSe 1 (Rev 5/16)  Complaint for a Civil Case

Defendant No. 3

    Name                       _____

    Job or Title
    (if known)                  _____

    Street Address           _____

    City and County         _____

    State and Zip Code      _____

    Telephone Number       _____

    E-mail Address
    (if known)                  _____

Defendant No. 4

    Name                       _____

    Job or Title
    (if known)                  _____

    Street Address           _____

    City and County         _____

    State and Zip Code      _____

    Telephone Number       _____

    E-mail Address
    (if known)                  _____

## II.   Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

    ☑ Federal question               ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

3

**A.      If the Basis for Jurisdiction Is a Federal Question**

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

1ST US AMENDMENT
42 USC 1981 & 1983
CIVIL RIGHTS VIOLATIONS

**B.      If the Basis for Jurisdiction Is Diversity of Citizenship**

1.      The Plaintiff(s)

   a.      If the plaintiff is an individual
           The plaintiff, *(name)* KEVIN CASSADAY                          ,
           is a citizen of the State of *(name)* MICHIGAN            .

   b.      If the plaintiff is a corporation
           The plaintiff, *(name)* NA                                 ,
           is incorporated under the laws of the State of *(name)*
           NA                      , and has its principal place of business in the
           State of *(name)* NA                    .

   *(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.      The Defendant(s)

   a.      If the defendant is an individual
           The defendant, *(name)* STATE OF MICHIGAN   , is a citizen of the
           State of *(name)* MICHIGAN            . *Or* is a citizen of *(foreign nation)* _____.

   b.      If the defendant is a corporation
           The defendant, *(name)* DOW CHEMICAL         , is incorporated
           under the laws of the State of *(name)* MICHIGAN            , and
           has its principal place of business in the State of *(name)*
           MICHIGAN            . *Or* is incorporated under the laws of
           *(foreign nation)* NA                    , and has its principal place
           of business in *(name)* MIDLAND, MI            .

   *(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

4

3.      The Amount in Controversy

The amount in controversy—the amount the plaintiff claims the defendant owes or the amount at stake—is more than $75,000, not counting interest and costs of court, because *(explain)*:

IN EXCESS OF $75,000
COMPLICATED TO DELINIATE
PLEASE SEE ATTACHED COMPLAINT

## III.   Statement of Claim

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

PLEASE SEE ATTACHED COMPLAINT

## IV.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

ACCOUNTABILITY
OBSTRUCTION OF JUSTICE BY DEFENDANT'S
ACTUAL & PUNITIVE DAMAGES
THREE TIMES THE AMOUNT FOR THE CIVIL VIOLATIONS TO BE DETERMINED
UPON DISCOVERY
MENTAL ANGUISH
RETALIATION, INTIMIDATION & HARASSMENT
TRICK SCHEMES

## V.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 8-18                        , 20 25        .

Signature of Plaintiff        _Kevin Cassaday_

Printed Name of Plaintiff    KEVIN CASSADAY

6

MIED ProSe 1 (Rev 5/16)  Complaint for a Civil Case

**Additional Information:**

## EASTERN DISTRICT OF MICHIGAN
## U.S. DISTRICT COURT

---

### PARTIES:

KEVIN WILLIAM CASSADAY

- PLAINTIFF

v.

STATE OF MICHIGAN, et al

- DEFENDANTS

### CASE #

**COMPLAINT**

**REQUEST FOR BENCH TRIAL**

**SUIT IN EQUITY**

**VIOLATIONS OF CIVIL RIGHTS**

**UNCONSTITUTIONAL LAWS & PRACTICES**

## TABLE OF CONTENTS:

|  | Page |
|---|---|
| 1. Cover | 1 |
| 2. Table of Contents | 2 |
| 3. Parties | 4 – 9 |
| 4. Jurisdiction | 10 |
| 5. Nature of Suit | 11 |
| 6. Cause of Action | 12 |
| 7. Complaint | 13 – 81 |
|     a. Matter #1 – Workers Disability | 12 – 20 |
|     b. Matter #2 – Michigan State Police | 21 |
|     c. Matter #3 – Healthcare | 22 – 56 |
|       i. Rehab Associates of Mid-MI | 22 |
|       ii. Covenant Health / Adams Neurosurgery | 23 – 25 |
|       iii. Henry Ford Allegiance Health | 26 |
|     d. Matter #4 – Attorney Grewal Law | 27 – 29 |
|     e. Matter #3 – Continued | 30 - 56 |
|       iv. Michigan State University | 30 – 31 |
|       v. Lansing Neurosurgery | 32 |
|       vi. Sparrow Health System / Lansing Radiology | 33 – 43 |
|       vii. Great Lakes Center of Rheumatology | 44 – 45 |

|  |  |  |  |
|---|---|---|---|
| viii. | Psychological Care | | 46 – 47 |
| ix. | Meridian Psychology | | 48 – 52 |
| x. | Lansing Institute of Urology | | 53 – 54 |
| xi. | University of Michigan Health | | 55 – 56 |
| a. | Matter #5 – MI BPL | | 57 |
| b. | Matter #6 – MI Bar Association | | 58 |
| c. | Matter #7 – Eaton County Sheriffs | | 59 |
| d. | Matter #8 – MI Courts | | 60 – 62 |
| e. | Matter #9 – Various | | 63 – 65 |
| f. | Matter #10 – MI Cannabis Regulatory Agency | | 66 – 71 |
| g. | Matter #11 – Hawks / Luebs | | 72 – 75 |
| h. | Matter #12 – MI Notice of Intent Law | | 76 – 79 |
| i. | Matter #13 – Divorce / 56th Eaton Circuit Court | | 80 |
| j. | Matter #14 – Blue Cross Blue Shield | | 81 |
| w. | Conclusion | | 82 – 83 |
| x. | Relief Requested | | 84 |
| y. | Affidavit | | 85 |

**PARTIES:**

PLAINTIFF –

KEVIN WILLIAM CASSADAY ~ IN PROPRIA PERSONA

4819 North Stark Road

Hope, MI 48628

kwcassaday@yahoo.com

989-615-7096


     v.


DEFENDANTS' –

STATE OF MICHIGAN, et al


1. State of Michigan - Gov. Gretchen Whitmer

    P.O. Box 30013
    Lansing, MI 48909

2. Michigan Attorney General – Dana Nessel

    525 W. Ottawa St.
    P.O. Box 30212
    Lansing, MI 48909

3. Michigan State Police – Dir. James F. Grady II

    P.O. Box 30634
    Lansing, MI 48909

    a. Trooper – William Luebs
    b. Trooper – (Unknown) Smith

4. Michigan Licensing & Regulatory Affairs – Dir. Marlon Brown

    611 W. Ottawa St.
    Lansing, MI 48909

    a. Fmr. Dir. Orlene Hawks

    Unknown Address

5. Michigan Bureau of Professional Licensing

    P.O. Box 30670
    Lansing, MI 48909

6. Governmental Consulting Services Incorporated – Mike Hawks

    120 N. Washington Sq.
    Suite 110
    Lansing, MI 48933

7. State Bar of Michigan

    306 Townsend St.
    Lansing, MI 48933

8. MI Rep. Sarah Anthony

    P.O. Box 30036
    Lansing, MI 48909

9. Eaton County Sheriffs Mark Wrigglesworth

    1025 Independence Blvd.
    Charlotte, MI 48813

10. Ingham County Sheriff Scott Wrigglesworth

    2045 Cedar St.
    Holt, MI 48842

11. Lansing City Police

    120 W. Michigan Ave.
    Lansing, MI 48933

12. Sparrow Health System / Lansing Radiology

    1215 E. Michigan Ave.
    Lansing, MI 48912

        a. Beinaz Menagi
        b. Richard Allen
        c. Laura S. White
        d. Aimee M. Tegtmeier
        e. Uygar Teomete

13. Michigan State University Health

    909 Fee Rd.
    East Lansing, MI 48824

        a. Nathan Condie
        b. Elizabeth Abdnour
        c. Kaylie Starka
        d. Mathew Saffarian
        e. Bruce Wolf
        f. Bradly Hoopingarner

14. Covenant Health (a) / Adam Neurosurgery (b)

    700 Cooper Ave
    Saginaw, MI 48602

    5400 Mackinaw Rd.
    Saginaw, MI 48604

        a. Mark Adams
        b. Helen Decorte
        c. Kolette Pacheco
        d. Diane Cehrcke

8. Lansing Neurosurgery -

    1575 Ramblewood Dr.
    East Lansing, MI 48823

9. Lansing Institute of Urology

    1625 Ramblewood Dr.
    East Lansing, MI 48823

        a. Leonard Zuckerman
        b. Megan Spicer

10. Great Lakes Center of Rheumatology

    4052 Legacy Parkway
    Ste. 200
    Lansing, MI 48911

        a. Joshua June
        b. Iyad Al-Shwaf

11. Rehab Associates of Mid-Michigan

     555 W. Wackerly St.
     Ste. 3825
     Midland, MI 48640

       a. John Szajenko

12. Dow Chemical Co.

     2211 HH Dow Way
     Midland, MI 48674

13. KVG Law

     3033 Orchard Vista Dr.
     Ste. 308
     Grand Rapids, MI 49546

       a. Robert Steelman

14. Grewal Law

     2290 Science Parkway
     Okemos, MI 48864

       a. Attorney Walsh

15. Henry Ford Allegiance Health

     205 N. East Ave.
     Jackson, MI 49201

       a. Frank Lamarca
       b. Craig Brand
       c. Waseem Ullah

16. University of Michigan Health

    1500 E. Medical Center Dr.
    Ann Arbor, MI 48109

        a. David Fessel
        b. Elizabeth Duval
        c. Samantha Goldberg
        d. Thomas Peter Claire Scott-Craig
        e. Nurse Linda M. M.

17. Kelli Brozanski (Cassaday)

    1804 Guenther Ave.
    Lansing, MI 48917

18. Michigan Department of Education – Dir. Dr. Michael Rice

    608 W. Allegan
    Lansing, MI 48933

19. Blue Cross Blue Shield – Gregory A. Sudderth, Frm. Danial Loepp

    600 E. Lafayette Blvd.
    Detroit, MI 48231

20. Other unknown co-conspirators & parties

## JURISDICTION:

1. The main defendants are the State of Michigan & its employees, which fall within the jurisdiction of EDMI & WDMI USDC.

2. Plaintiff is confined & resides in the EDMI USDC boundaries.

3. The content matter of this suit falls under the U.S. Constitution, federal laws &/or treaties, civil rights violations.

4. The amount is in excess of $75,000.00

5. Mr. Cassaday, plaintiff is Native Indian, he is not technically a citizen of the state, he is a resident of the state, he owes no allegiance to the state to which he resides, & the state offers no protections; meaning he is only subject to the laws thereof with no rights except as provided by federal law.

6. The state can waive its sovereign immunity of the 11th U.S. Amendment, & plaintiff has no representation in congress.

7. The courts have supplemental jurisdiction to hear the additional claims brought by Mr. Cassaday.

8. 42 USC §1981 & §1983, 1st U.S. Bill of Rights.

9. 18 USC §1964(a)(c) & §1965(a)(b)(d)

10. This court has jurisdictional authority on this matter.

**NATURE OF SUIT:**

1. This action may fall under numerous topics of suit,

    a. Torts

        i. 320 Assault, Libel & Slander

        ii. 360 Other Personal Injury

        iii. 362 Personal Injury – Medical Malpractice

        iv. Health Care / Pharmaceutical Personal Injury Product Liability

        v. 370 Other Fruad

    b. Civil Rights

        i. 440 Other Civil Rights

        ii. 446 Americans W/Disabilities Other

    c. Labor

        i. 710 Fair Labor Standards Act

        ii. 720 Labor / Management Relations

        iii. 751 Family and Medical Leave Act

        iv. 790 Other Labor Litigation

    d. Other Statutes

        i. 470 Racketeer Influenced & Corrupt Organizations

        ii. 890 Other Statutory Actions

        iii. 950 Constitutionality of State Statues

## CAUSE OF ACTION:

1. 18 USC §4 – Misprision felony

2. 18 USC §241 – Conspiracy against rights

3. 18 USC §242 – Deprivation of rights under color of law

4. 18 USC §1512 – Tampering with a witness, victim or an informant.

5. 18 USC §1513 – Retaliating against a witness, victim or an informant.

6. 18 USC §1514A – Civil action to protect against retaliation in fraud cases.

7. 18 USC §2331(5)(A)(B)(i)(ii)(C) – Domestic terrorism

8. M Crim JI 16.18(1)(2)(3)(4) – Gross negligence

9. MCL 691.1407(2)(c) – Governmental liability for negligence

10. MCL §333.27963(4)(b)(c) – MI regulation & taxation of Marihuana Act

11. 42 USC §1981 – Equal rights under the law

12. 42 USC §1983 – Civil action for deprivation of rights

13. Elliot-Larson Civil Rights Act

**COMPLAINT:**

**MATTER #1 – Workers Disability & Compensation**

1. Mr. Cassaday applied to work for Dow Chemical Company, Midland, MI around 10-2010.

2. Mr. Cassaday went through Dow Medical Services for pre-employment review of his medical records, history & ability to perform the work; conducted by Evergreen Physical Therapy.

3. Mr. Cassaday was able bodied & passed all exams, being subjected to further scrutiny by the company's doctors due to the history of his back ailments & Cassaday was approved as he had no troubles ambulating or doing work at this time.

4. Hire date of 1-31-2011, after previous cancellation of an earlier start date.

5. Mr. Cassaday was hired to work in Methocel as an Hourly Logistics Packager/ Part Time Hourly (HLP/PTH).

6. The job details states, "a typical schedule consists of at least 40 hours of work per week."

7. On 11-14-2011 Mr. Cassaday was promoted to Site Logistics Level 1 (SL1).

8. During this time frame at Methocel, Mr. Cassaday was forced to work on equipment that was broken, having to manually assist in lifting shaker tables that weighed 100+ pounds, maybe upwards of 160 pounds per table.

9. Mr. Cassaday having to use his left arm to lift to assist in lifting.

10. Mr. Cassaday was to do whole batches, by himself, on these lines due to him getting things done & lack of staffing.

11. Each batch amounts to more than 300+ bags weighing 25kg, or 55.1155655 pounds.

12. Mr. Cassaday having to assist in lifting these tables more than 300 times per shift was abusive, & a failure of the company to provide a safe working place.

13. During this time frame, the CEO, a foreign citizen, sent out a company letter stating things *along the lines* of "he had marks to meet with stockholders & to watch spending, 'but safety should be considered.'" (emphasis added)

14. The result of this email is a subliminal message to his employees to watch all spending, even though he mentioned 'safety,' it was alleged it was a message to not spend, regardless of if it posed a safety concern.

15. Mr. Cassaday started to have physical troubles, he went to his SL3 shift supervisor & told him that he was having troubles.

16. Shortly thereafter, Mr. Cassaday was promoted to a more laborious job as an SL2 in Dow Adhesives on 8-20-2012.

17. Cassaday's new position was titled as a 'Runner,' his job entailed compiling a batch list of products, measuring them out & staging them for the individual who would cook the products into the epoxy resins.

18. The new job was a newer venture of Dow Chemicals into automotive epoxy.

19. The building to which Mr. Cassaday did most of his work was across the street in a pole barn full of products on shelves that most of which sat on pallets.

20. Some items were extremely light, but many were above 50 pounds by their weight measure was typically kilograms, as explained above in Methocel.

21. The site was under construction upon Cassaday's arrival, the division had high turnover rates & could have been used as an avenue to rid employees of the company.

22. On the morning of 9-4-2012, or around, Mr. Cassaday arrived at work to hear that the SL3s had to make batches all weekend themselves, meaning there was no employee there to compile the batches, his job, Cassaday was not subject to being forced to work as he had not passed his LRB, job initiation, he was essentially still in training, even though staff asked him the Friday before if he wanted to take his test, Cassaday not feeling quite ready due to the newer procedures, declined.

23. Cassaday went to work on the next batches, alone, he went to the pole barn across the road, if recalled correctly he drove the fork lift across the road, the stand up forklift had had troubles repeatedly, forcing individuals to manually maneuver product, & or use the other fork lifts that don't quite fit in some isles, the barn was a mess due to other individuals not familiar with the area over the weekend.

24. Cassaday was compiling products, he had to get a product that was close to the staging area, but it was blocked by ongoing electrical construction in the building.

25. Mr. Cassaday would point to this as a previous instance during his construction years, he was told to clean an area, he cleaned & cleaned, & as he was in a major construction zone at Hemlock Semi-Conductor, all contractors had just lined things up along the fence, no real borders or lines drawn, he ventured into another contractors things, & it all hit the fan, not a big deal in the end, but he was cautious ever since of moving anything.

26. Mr. Cassaday bent over to get this product from a pallet, he felt a pop in his low back, he didn't think much of it, as the morning went on he started to have troubles, he wanted to do his job, he kept trying to work, he had to pick up a bucket of color at the scale, & weighed out the amount needed, he again

had trouble with these pales as it is believed to weigh was in excess of 50 pounds, & again had pains in his back.

27. Cassaday continued to work, he kept trying not to have issues, in the end he realized he was having real troubles so he notified the shift supervisor on the site & then was taken to Mid-Michigan Health Hospital for treatment, by Dow ambulance.

28. The week prior, a couple employees noticed Mr. Cassaday couldn't keep up with their walking speed, joking that his long legs can keep up? Or something along those lines.

29. The timeline given by a Dow HR employee states on 8-20-2012 "SL2 Wage increase but did no benefits because he did not pass LRB (so no LTD available)"

30. Mr. Cassaday did more than 30 visits with physical therapy, he kept being told he needed "work hardening."

31. Mr. Cassaday had a Functional Capacity Exam on 2-18-2013 which said his Overall Level of Work: Falls within the Light range. Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (constantly: activity or condition exist 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. & etc.

32. On 3-18-2013 the HR again noted "Separated from the company because he hit the 6 month trigger on 3-4-2013.

33. Another timeline shows on 3-19-2013 his employment was terminated.

34. As Mr. Cassaday was under the United Steelworker, Local 12075, when Cassaday contacted the Business Agent, he stated that "he was told Mr. Cassaday quit."

35. Mr. Cassaday then filing a Charge of Discrimination with the MIOSHA Discrimination Complaint form on 5-31-2013 notarized by Mary J. Jackson Notary of Public State of Michigan, this complaint was filed under [x] Disability.

36. This complaint as well went to the Equal Employment Opportunity Commission under 471-2013-02153

37. Mr. Cassaday filed a Workers Compensation Claim through an attorney in the State of MI after discharge.

38. Shortly after filing such claim, Mr. Cassaday noticed vehicles parked outside his home, those vehicles parking on the road in attempt to peer in through the windows.

39. Those individuals, one lived a couple of miles down the road, one of the others is unknown, & one had contact with police as explained below under Matter #2.

40. It is also alleged these individuals would follow Mr. Cassaday if he left the home, & one instance in particular, while in Saginaw, MI with his spouse, such individuals lightly bumped into Cassaday's wife's car at a red light, when Cassaday got out, such driver tried to sound foreign of nature. Mr. Cassaday had seen no damage & continued through life, but it still sticks in his mind as he believes these individuals were hired by the attorney that was hired by Dow Chemical.

41. The attorney firm hired is KVG Law, Grand Rapids, MI, Robert Steelman was the attorney of record for Dow Chemical.

42. Mr. Cassaday's Workers Comp claim was filed in the Saginaw, MI site under 062215006 Hon. Lisa Woons.

43. Mr. Cassaday did some research on this individual, finding out that she was actually a member of KVG Law, showing there was coercion to get judges placed by the company in the companies defense to keep workers from getting claims or benefits, Mr. Cassaday notified his attorney in which she brought it to the attention of the courts, she was shortly thereafter taken off my case as well, Cassaday's attorney.

44. Hon. Emil Louis Ognisanti P23130 was the other judicial officer, he is who held the trial of this workers comp case, forcing a closure shortly after

Cassaday called the authorities on the investigators harassing & intimidating him.

45. It turned out too, that Hon. Ognisanti was previously an employed attorney for Dow Chemical at some point, he most likely had stocks in the company & would defend them to no end as it would affect his stock prices.

46. This conduct shows a repeat layers of judicial officers that have a bias & prejudice against anyone who comes before them, they have interests in the company, & Woons had possible interests still in KVG Law, as it is a path to higher courts, allegedly being manipulated by the CEO Andrew Liveris, again a foreign citizen that has no allegiance to American workers & or their safety, they are essentially his slaves.

47. A lower court number comes up as 20-000011, which may be an appeal Mr. Cassaday tried to file.

48. On 3-4-2021 Mr. Cassaday filed an appeal in the Michigan Court of Appeals (MI COA), 356480 Cassaday v. Dow Chemical Co. under the Hon. Murray, in attempt to still seek remedy & to show that due processes were violated, judges placed in the courts, intimidation, retaliation, causing duress, mental anguish, & obstruction of justice among many others.

49. Mr. Cassaday had endured other events that he will try his best to delineate herein, the best he can as the abuse continued for years on end.

**MATTER #2 – Michigan State Police**

1. On 5-14-2014 Mr. Cassaday contacted law enforcement to report harassment, intimidation, & retaliation due to a workers compensation claim he had, in which the conduct started around 9-2012.

2. Drew Patterson #555 responded & had contact with one individual of the numerous, a Jason Wade Murray who admitted to investigating Mr. Cassaday.

3. The trooper stated that he was a "licensed private investigator," which was not true, the trooper did not file a report as he should have, committing gross negligence to reporting criminal conduct & failed in attempting to stop the harassment in & to Mr. Cassaday's life.

4. Mr. Cassaday tried reporting this to the Michigan Bureau of Professional Licensing, in which stated, "being he was not licensed they do not have jurisdiction."

5. The issue presented is the fact an unlicensed individual was following, intimidating & harassing Mr. Cassaday, the proper chain of command was followed by Cassaday, in which the State of MI failed to investigate & stop the abuse, there is a money trail of criminal conduct in which the State of MI was complicit in.

## MATTER #3 – Healthcare

### Rehab Associates of Mid-Michigan

1. Mr. Cassaday was seeing a Pain Management Doctor at Rehab Associates of Mid-Michigan in Midland, MI; Dr. John Szajenko, patient since 2008 & records shared with Dow Chemical.

2. After this work injury, the doctor's office, in a sorts, made it hard for Mr. Cassaday to seek care.

3. The Dow Chemical Company put on a Case Manager, and/or their insurance company, who accompanied Mr. Cassaday to numerous doctor visits at this office, the last visit the Case Manager asked for records pertaining to Mr. Cassaday, & the secretary did give her such. No known release of information exists; the secretary was dismissed shortly thereafter.

4. Mr. Cassaday underwent lumbar three separate epidural injections at the L4 – L5 & L5 – S1 levels in October of 2012, with no gain of function.

**Covenant Health – Adams Neurosurgery**

5. Mr. Cassaday saw a neurosurgeon, Dr. Mark Adams from Adams Neurosurgery, main office Saginaw, MI & one visit was held at the Mid-Michigan Health Hospital too, once at their Mt. Pleasant, MI office.

6. Dr. Adams recommended a Posterior Lumbar Interbody Fusion of L4 – S1.

7. Mr. Cassaday had care through a family doctor at Mid-Michigan Health until he lost trust in his care, as a whole, maybe ending around 2014 or 2015.

8. Mr. Cassaday went to Dr. Szajenko to discuss switching from opiates that were making him sick from time to time, to Medical Marijuana, the doctor being open to discussion, said "he would not prescribe both, & that Mr. Cassaday would have to choose which one."

   a. Mr. Cassaday is grateful for this discussion as it led to him quitting smoking tobacco, cutting out soda pop, & changing the foods he ate, being more conscious to his intake.

   b. Mr. Cassaday had nerve studies done at one point by Dr. Szajenko, but the focus was on the left leg extremities, when that didn't produce any signs of neuro deficiency, the doctor checked the right leg of Cassaday, in which the machine made noises, static sounds, which did show neurologic impingements are present, it is believed the doctor ignored this & never documented the truth.

c.  When Cassaday asked the doctor about this, he was discharged from their practice around 2-2-2017.

9.  Mr. Cassaday became a Michigan Medical Marijuana patient around 2015.

10. Cassaday moved to Lansing, MI around 1-2017.

11. Cassaday in 2019 had L4 – L5 & L5 – S1 Left Facet injections, three visits, the first visit the doctor only did one level, not performing the full surgery.

12. This first visit as well, as Cassaday was put under his arm burnt.

13. Cassaday questioned this failure to complete the full scope of the procedure, but was met with tactics to deflect.

14. Cassaday returning for the second series of injections, he was put under & his arm didn't burn, the full scope of the procedure was completed both levels.

15. The third time Cassaday went for these injections when he was put under again his arm burnt, both levels completed in the end.

16. The facility did bill out for both levels on all three occasions, the insurer contesting the charges & unknown outcome of if the doctor was paid for both levels on the first injection.

17. On 2-22-2019 Cassaday called the office to discuss that these records are wrong.

18. Kloette Pacheco CMA was whom Cassaday spoke with at first, Miss Pacheco kept lying about the records, kept trying to provoke an adverse response & in the end she said "I am recording this call, I am recording this call."

    a. Cassaday then said "I have been recording this call."

    b. Pacheco tried to schedule an appointment, believed to be after closing, she then passed off Cassaday to someone else in which they did make the appointment.

    c. Helen Decorte NP referred Cassaday to a Dr. Frank Lamarca at Henry Ford Allegiance Health in Jackson, MI after a full MRI study was performed on Cassaday.

**Henry Ford Allegiance Health**

19. Cassaday arrived to this appointment, he had a scoliosis study before the exam.

20. One of the techs kept asking "why are you here, why are you here?"

21. Cassaday was to stand with his arms up for the Coronal view image, he was in place & the radiologist said to "step forward, step forward."

22. Cassaday did as told, but again the change in posture did manipulate & possibly nullify the results.

23. Cassaday & his now ex-spouse did go see Dr. Lamarca that same day in which he was not told any diagnosis's, & made none, this comes into play under Matter #4.

## MATTER #4 – Attorney at Grewal Law

20. Around this time Cassaday, even over the years continue to seek legal help to no avail.

21. Cassaday reached out to Grewal Law, in which he gave some information, he then received an declination of assistance, so he called the firm asked to speak to someone in which he was given to an attorney Walsh.

22. Cassaday described the matters he encountered at Sparrow Health, some of the events overlap & are intertwined to which he had to describe the events.

23. While describing things, Cassaday brought up the events with Dr. Adams & Dr. Lamarca.

24. The attorney then said, "Dr. Adams & Dr. Lamarca are our expert witnesses & you won't find another doctor to go against either one of them."

25. Cassaday said "you should have said that in the first place," in regard to these doctors being their clients.

26. The words from this attorney are a threat to obstruct justice & shows that the system is corrupt, & before Cassaday sees the light of day he will be defamed in attempt to keep those 'expert witness testimonies'

in court over the reality of Mr. Cassaday & the abuse he continued to endure.

27. It is believed that after this call, that attorney notified the doctors of topic that he was seeking legal assistance.

28. The next visit with Dr. Adams, there was a scribe present, documenting the conversation of the appointment, during this conversation Dr. Adams looked at the scribe & said "do not record this next part."

   a. The doctor turned to Mr. Cassaday & said something along the lines of "if you continue to press these issues you will have inexperienced or no help."

   b. Dr. Adams turned to the scribe & said to "start again."

   c. Cassaday replied "I understand."

   d. These were subliminal threats to obstruct justice in Cassaday's life, even after the visit, as his then spouse was present at this visit, he talked to her about what happened, & how that is not how that is supposed to work, she working for the State of MI said "they do it all the time."

   e. Cassaday explaining to her that what he said was a threat, but he didn't understand the full extent to the threat at first & didn't

deem it that until further events led to a clear conviction that it was.

29. Referral to University of Michigan in early 2019 with no real conveyance of diagnoses.

**MATTER #3 - Continued**

**Michigan State University**

30. Because of Cassaday moving to Lansing, MI his neurosurgeon referred him to an neurologist at Michigan State University, in which Cassaday seen an Osteopathic Manipulative Medicine doctor among others, & pain management doctors.

31. One doctor ordered a leg length x-ray in which was performed, but Cassaday was told to stand on an imaginary location on the floor, he stood in the place, the doctor said move in a direction, & before he went & took the study, he took & manually pushed Cassaday straight up, in which nullified the study, the patient is to be in a natural position.

32. Dr. Nathan Condie did exams on Cassaday, in which he took the legs of Cassaday & pushed inwards in which resulted in extreme pain, showing degenerative discs that are weak & the doctor did note this in the records, that he performed this & pain resulted, this doctor had Mr. Cassaday look up on his phone Ankylosing Spondylitis (AS), there was no record of the diagnosis.

33. When things got complicated with Sparrow & other doctors, there was a clear change in care, Mr. Cassaday being sent to their Pain

Management & Recovery PM&R doctor, to which this doctor

Saffarian had a patient come in & harass Cassaday, told him to lay

back on the table in which he did, the student unaccompanied started

to manipulate Cassaday's legs but quickly seen that he was struggling,

the student ceased immediately & then the Dr. Saffarian came into the

room, stating that "if he would have caught it in time he would have

refused care."

34. It was clear there was a change in care, in which Cassaday ceased

going to MSU Health.

**Lansing Neurosurgery**

35. Mr. Cassaday tried to change his neurosurgical care after they moved as the distance in previous care was hard at times to do.

36. Cassaday on 3-15-2017 did go to a scheduled appointment at Lansing Neurosurgery, he didn't see the doctor, he was confronted with maybe an NP to which was very off-putting in helping Cassaday.

37. The office construed the visit to Cassaday seeking "restrictions," which is not true, he sought to put medical care in place in case he needed to move forward with any surgical care.

**Sparrow Health System – Lansing Radiology**

38. Mr. Cassaday sought continuity of care at a local hospital starting shortly thereafter Sparrow Health System.

39. Cassaday had a scoliosis x-ray study performed on 7-18-2017, <u>1 View</u>, in which was a concerted attempt to deny Mr. Cassaday his ailments, to keep him a slave, that stemmed from the 2012 workers' compensation claim.

40. A true scoliosis study is 3 dimensional, at least two views, a side view & a forward to backward view, to diagnose the true scoliosis.

41. When Mr. Cassaday realized the study didn't make sense as read, he asked his doctor again to perform the study, 3-16-2018 XR Thoracic Spine <u>4vws</u> complete.

42. When Mr. Cassaday went for this exam, he again was met with more than one individual trying to keep him from knowing the coronal view angles.

    a. Cassaday did the study, the tech said "he was all set."

    b. Cassaday asked about a side image that should be taken.

    c. The tech said, "he would have to get approval," the tech stood there then said, "would you like me to do that now?"

    d. Cassaday replied "yes."

e.  The tech called his doctor & got approval, showing a concerted complicity to deprive others of their ailments.

43. The study was taken.

44. On 3-1-2018 radiologist Uygar Teomete read the imaging, but did not read it in its entirety.

45. Mr. Cassaday called Lansing Radiology, a subsidiary of the hospital to which the order originated.

46. Cassaday left a message as there was no answer in regards to the report not being read, there were no degrees of angle of severity.

47. Addendum #1 read on 3-1-2018 the radiologist tried to limit the scope of the study, by vaguely reading the imaging again, but also mismarking the defects as C6 – C9, the neck. Sta ting the kyphotic angle is 49 degrees.

48. Cassaday called again to Lansing Radiology, in which the receptionist stated "she has no idea to what we are talking about, here is the radiologist."

49. The radiologist got on the phone & started to downplay the imaging again, stating "that it is not bad, they don't do surgery for this & etc."

50. Cassaday in the end told this individual to "do as you were taught."

51. The radiologist read the imaging under addendum #2 in which states "additional image labeled "Standing" was provided for review." Overall Cobb angle from T2 – T12 is 84.1 degrees.

52. Another radiologist read the study under addendum #3 confirming that T2 – T12 is 84 degrees.

53. The conduct showed an agenda to keep Mr. Cassaday a slave, to deny the pains he has & disabilities that obstructed his filings for Social Security Disability Income, that stemmed from the doctors dating from 2012 till even current.

54. Sparrow Health at one point in their records would ask the patients their ethnicity, American Indian / Alaska Native was a selection, at one point it is alleged the facility removed such a selection & Mr. Cassaday wrote this in manually, the conduct shows bias & prejudice to one select race & discriminatory conduct.

55. Mr. Cassaday sought to get numerous types of care while at Sparrow, seeking psychological care due to the continued abuses Mr. Cassaday had endured of previous events with no accountability & help in his matters, & to just keep up on his mental health due to the physical disabilities & how that can play on someone's mentality, care was denied in which his doctor said we don't offer any psychological care.

On 7-17-2018 it was reported in Cassaday's medical records that he sought care for his upper back & a psychologist.

56. Records state "D/w him that we no longer have a psychologist at SPMC."

57. From this point forward there was a clear agenda to keep Mr. Cassaday from competent & respectful care, he was subjected to retaliatory conduct & attempts to obstruct justice by numerous individuals.

58. At Cassaday's last visit with Dr. Beinaz Menagi MD, in hindsight she seemed to try & create a false light & was biased & prejudice to Cassaday.

59. On this last visit, Dr. Menagi said things that.

    a. "I've worked here for 20+ years," or whatever # she gave

    b. "People like you yell at me."

    c. "Make fun of my hood."

    d. Etc.

60. Due to the inhospitable nature of this visit, & previous clear conduct to obstruct Cassaday he asked Patient Care to change doctors.

61. Cassaday's new doctor, Dr. Richard Allen on 4-22-2019 stated "We can NOT refer him to 6 different places. This patient has been a real issue for us."

62. One of these next visits with Dr. Allen, he was abusive.

63. Cassaday asking "am I going to continue to have problems with you?"

64. Dr. Allen saying something about "are you going to keep reading your imaging? It is like you are just throwing things at the wall to see if they stick." & called him psycho sematic.

65. Cassaday seeking care at Sparrow Health after all this continued retaliation he was experiencing.

66. On 9-7-2020, more than a year later, Cassaday sent a message as he realized at this point there was a serious agenda to lie about his ailments, & a clear conspiracy to deprive him of help; he sent an Non-Urgent Medical Question to his doctors at Sparrow Health.

    a. Message verbatim to Dr. Menagi

      Who do I talk to about you and your abuse? You were falsifying my medical records to slander the patient. Playing games with the patient. You discriminated against me, then tried to flip the tables on me to run me

off, saying "people like me are mean to her". Trying to get me to make fun of her hijab? Threatening me.

You have been abusive to me Menagi and I am concerned for all patients in your care…

Ganging up on patients, creating false records then playing monkey in the middle with that patient to try and bolster the falsehoods of their diagnosis'

Sparrow and Menagi are on a slander campaign on me, falsifying my records to hinder the patient and desensitize.

b.  Message 9-7-2020 to Dr. Allen

You were falsifying my records and are now playing monkey in the middle with those false records. Calling me a psycho sematic to my face and trying to desensitize everything wrong with me.

Yep a patient with AS, Scheuermanns, lumbar pars break and uneven base. Yep no big deal…

You are an abusive doctor Richard Allen, falsifying my records to cover up for yourself.

You have been abusive to me and I want to file a complaint on you and everyone involved now in your scheme to abuse patients.

67. Cassaday had tried maybe in 2019 to get his medical records from Sparrow Health, they created a document in attempt to obstruct Cassaday obtaining such records.

68. Cassaday went to Sparrow Hospital in attempt to do an onsite review of his records, the Information Desk, seen this document created to obstruct & said "I have never seen that document."

69. Cassaday later "voiding" the document but still had trouble obtaining his records in the prescribed time frames by law.

70. During this onsite visit attempt, as Cassaday was being denied those records he did call the police, dispatch said "that is a civil matter," it is unknown the location this call went to.

71. Mr. Cassaday would like to express his concern with this, as his medical records are kept from him to create & continue a false light, in attempt to defame him if he chooses to come forward, information to ones life is a civil matter in the State of MI?

72. On 9-8-2020 a Laura S. White RN from Sparrow wrote in Cassaday's records.

   a. "Called patient and left a message for the patient to return my call. Patient sent 2 inappropriate messages (paranoid) emails. One to Dr. Rich Allen the other to Dr. Beinaz Menagi. Made second attempt to reach patient went straight to voice mail. Called and left message on wife's answering machine asking for her to return my call.

   "Checking on your husband as he sent us a couple of inappropriate emails".

   Discussed with Risk Management. Risk to call patient experience to try and contact patient.

   Called Eaton Co 911 to do a welfare check.

73. On 9-8-2020 Mr. Cassaday wrote.

    a.  "You all sent an officer to my house to retaliate against me, creating these assumptions I'm going to hurt myself? What is wrong with you people, you are the issue and your desensitization.

       You all are OUT OF LINE

74. On 9-9-2020 Laura S. White wrote.

    a.  At this time I have inactivate Mr. Cassaday's My Sparrow access as he continues to use this access inappropriately.

       Mr. Cassaday's wife, Kelli, did return my call today. States she was home when police arrived. Police asked if he was a threat to himself or anyone and left. But Kelli states he is not ok. Kevin is taking meds prescribed by psychiatrist but not working. He stopped seeing his psychiatrist when Covid hit and she is trying to get him to call or see a psychiatrist or another. He is going to need medication refills so she is hopeful he will call his psychiatrist or see him. "He won't call anyone as he is afraid of the phone so he will not return your call". Discussed

with Kelli that should she feel Kevin is a threat to himself or

others she should call police and they would assist in App and

Cert and take him to the hospital for psych eval. Wife grateful

for that information. I informed Kelli that MySparrow access is

being inactivated due to Kevin's inappropriate messaging.

Should he stabilize we could return access.


I am working with Risk and Legal to discharge.

75. On 9-9-2020 Aimee M. Tegtmeier DO said,

    a. "SAVE for Dr. Menagi to look at."

76. 9-9-2020 Dr. Allen said,

    a. "Thanks. Did you start the process of removing him from our

       practice? I will not see him again.

77. The facility waited for two days so that it would fall on 9-11-2020 to

send a letter of discharge to Mr. Cassaday.

78. The conduct of the above alone is menacing to anyone, but when it is

in regards to a persons medical care & the truth, that poses a danger to

society to take that healthcare & highjack it & then bully the patient

by intimidation, retaliation, & obstruction.

79. The calls to Mr. Cassaday's now ex-spouse was to fearmonger her, & it worked, creating a false light to harass Cassaday into custody.

80. Shortly after these events, there was a reporting in Lansing, that someone called a welfare check on another individual, in which resulted in the loss of that life due to that possible false narrative.

81. The underlying question is when the medical field gangs up on an individual due to their actual misconduct in attempt to cover up their such malpractice & silence the truth. Best said under,

    a. American Standard Version

        Job 13:4-5

        4      But ye are forgers of lies;

              Ye are all physicians of no value.

        5      Oh that ye would altogether hold your peace!

              And it would be your wisdom.

**Great Lakes Center of Rheumatology**

82. Mr. Cassaday was sent to a rheumatologist at Great Lakes Center for Rheumatology.

83. These visits started out good, a little withdrawn to diagnose, but investigation into the ailments was carried out.

84. This doctor at one point had given Cassaday a book on Ehlers Danlose, in which after reading the full book can only make his own diagnosis to the ailment of Ehlers Danlose – Kyphoscoliosis type.

85. Cassaday tried to get a DNA test that would diagnose, but the doctor said he didn't need it, as it is obvious in some cases, like.

86. One visit Mr. Cassaday seen a different doctor, who had his staff take his imaging CDs, returned them to Cassaday, then came back & took them again.

87. Cassaday was told the CDs were destroyed.

88. After this destruction of his imaging CDs, a full CD with all the imaging at Sparrow was mailed to Cassaday, showing there was an underlying agenda, as the CDs Cassaday had, did not have the radiology reports tied to the imaging.

89. The care clearly changed in 2020, the last visit with this doctor was a very seclusive setting due to COVID, but Cassaday & his wife were

taken to the room & waited about one hour & Cassaday stepped out of the room & asked staff where the doctor was.

90. The doctor came in shortly thereafter, happy that COVID was fueling commerce in masks.

91. The doctor was extremely rude, wearing a full paint mask in which it was hard to hear or have any meaningful conversation, Cassaday feeling he was being toyed with in attempt to run him off in the first place said "I am not going to take this," & left the office.

92. The facility has obstructed justice by.

**Psychological Care**

93. Due to all these events, & at some point Cassaday continued to seek psychological care, he called his insurance company Blue Cross Blue Shield & the referrals he received all said "they don't treat adults," or other excuses.

94. Cassaday continued to seek care due to the ongoing inhospitable environments he was experiencing, he called the local Community Mental Health, in which he was denied care, Cassaday was told "he doesn't meet the threshold."

95. Due to all the oppressive environments, Mr. Cassaday's then spouse was working for the State of MI, she recommended a hotline for government employees & family members that they could call if in need of help, general help maybe.

96. One day Mr. Cassaday did call this hotline seeking help getting psychological care.

97. The name may be Peter Mason to whom Cassaday talked with, he did help as Cassaday was bawling.

98. Mr. Mason was helpful in calling Meridian Psychology East Lansing, MI & getting Cassaday set up for initial intake & care.

99. The abuse did continue in Cassaday's life, he did call back to talk with this Mr. Mason but he acted like he didn't know Cassaday & ran him off.

**Meridian Psychology**

100.    Cassaday did go to see a psychologist & psychiatrist at

Meridian Professional Psychology

101.    Cassaday liked both doctors to start, he felt safe at first, but

after he shared information in regards to the Dow Chemical claims he

raised, the environments changed.

102.    Believed to stem from the office manager in being retaliatory to

Mr. Cassaday & the issues he had encountered.

103.    Mr. Cassaday having troubles obtaining his medicine through

the Meijer Pharmacy.

104.    Cassaday wanted off one med, in which he did discuss with his

doctors, going back to the time at Sparrow Health & Dr. Menagi.

105.    One med was prescribed for anxiety, in the end may have not

been necessary, as sometimes when meds that are not needed &

prescribed, they can create adverse effects in that person.

106.    In which Cassaday took till the day he was incarcerated, then

such med was discontinued & he did fine through everything he has

encountered over the last four years.

107.    On 3-4-2019 Cassaday had an appointment with his

psychologist, whom he had many good conversations with as he was

also Native Indian & black man who did unfortunately be forced to go
to Native Indian Boarding Schools, there was a good connection
between the patient & the doctor.

108.    The events shared with this doctor though, resulted in nothing,
even though Cassaday is forced to continue psychological care, these
events don't matter, there is no help for others actual conduct outside
of the courts.

109.    Again, on this date 3-4-2019 Cassaday had this meeting, he
took his wife's car to this appointment, he left the room with the
doctor, having to walk through the lobby he can see the front road
from inside the building, Cassaday still thinks he noticed a car sitting
at the entrance of the office. He had to walk downstairs & out the back
door to where the parking lot was.

110.    Cassaday taking his time, no vehicle still entered, so he slowly
proceeded towards the driveway along the side of the building, when
he came to the corner, that vehicle was still sitting at the entrance.
Cassaday was waiting, with no progress from the vehicle.

111.    Cassaday proceeded up the driveway, slowing down again
where the handicap parking is as it is wider there.

112.    The vehicle on the road still sat there, so Cassaday assumed there was a mechanical issue, cars were lined up behind this vehicle.

113.    Cassaday proceeded to the end of the drive after no progress was made from the other vehicle; when Cassaday first got to the road, he could have went, just as he told the judge in the Ingham County Courts "I could have went, but I would have not waited the three seconds or whatever it is, so I waited."

114.    Two vehicles were coming from the left of Mr. Cassaday & as he wanted to turn left, he decided he was going to go after the cars passed.

115.    The vehicles came & went, & as the second passed Cassaday started out the drive onto the roadway, pausing again to look at the vehicle that was sitting there.

116.    That vehicle then floored it, & as it went by the fumes from the exhaust were prevalent & pouring out the back.

117.    Cassaday felt that if he had not looked twice, he would have been blindsided.

118.    Cassaday pulled behind that said vehicle, numerous cars were behind that car in the first place & they all allowed Cassaday to file into line.

119.    The vehicle driven by a Bradley Richard Hoopingarner was in front, it came to a road that he could have turned down, he started to brake check, then as the road passed, he sped up, then again brake checking until Cassaday rear ended the vehicle.

120.    Mr. Cassaday was given a Basic Speed Law ticket, & the driver of the vehicle was very uncooperative with law enforcement, in which he had his vehicle towed, as Cassaday drove his wife's punctured radiator vehicle home about 15 minutes away.

121.    The officer did a field sobriety test on Hoopingarner, in which he walked home after this incident.

122.    Cassaday took the ticket to the Ingham Courts in attempt to have it overturned.

123.    As he explained before, & to the judge that day, the judge stopped Cassaday midsentence & said something along the lines of, "if I had to guess, I would say this was staged."

124.    Cassaday thought this, even though he never shared those thoughts with anyone.

125.    Further research showed that Hoopingarner was maybe employed by MSU, recently encountering legal issues, beyond that

Cassaday has no investigatory powers, & his pleas & complaints all went ignored.

126.    Due to the events in 2020 of COVID, Cassaday had one more meeting with his psychologist on the phone & the doctor said "Cassaday sounded good." This was just after Cassaday lost his mother to colorectal cancer.

**Lansing Institute of Urology**

127.    Mr. Cassaday having urinary issues was referred to Lansing Institute of Urology.

128.    An MRI Prostate w wo (with/without) contrast was performed on 3-25-2019 at Sparrow Health System.

129.    The report of this study was written in a provocative way, lines ended mid-sentence & continued on another line.

130.    Mr. Cassaday reviews his own imaging, he could see three nodes in his prostate, the radiologist does describe the nodes as PI-RADS 2 – Low (clinically significant cancer is unlikely to be present).

131.    Cassaday seeing the way things are written did go to Patient Care at Sparrow Health to discuss this.

132.    Cassaday's next visit with the Dr. Zuckerman at Lansing Institute of Urology, the doctor told Mr. Cassaday "he doesn't read imaging."

133.    Cassaday had multiple prostate exams, maybe on two separate occasions, in which he feels a bit violated & assaulted.

134.    One visit with a Megan Spicer, Cassaday came to the appointment, he was taken to the room in which he sat for an hour, he

came from the room to leave, finding out the place shut down, lights
were off & employees were sparce.

135.	Cassaday went to the front desk & asked for a refund, in which
he was confronted by Megan Spicer, she coaxed Cassaday into having
this visit & it proceeded.

136.	The events drove off Cassaday from continuity of care that he
requires.

**University of Michigan Health**

137.    Mr. Cassaday went to UofM for medical care as these other facilities seemed to be ganging up.

138.    Cassaday having a urinalysis done, scope & again the first visit with this doctor was good.

139.    During the exam & procedure, as the doctor was inspecting the bladder, he told Cassaday "look, look, look" at the screen, Cassaday looked & as he did the doctor spun the scope really fast.

140.    The exam had nothing to do with another part of what was done, to Cassaday's knowledge.

141.    Cassaday arrived for this appointment, the nurses prepped Cassaday, & he was told to roll over on the table, a probe was then inserted to the rectum, in which again was not discussed at any point with the patient, the results were a bit controversial to the ailments Cassaday experiences.

142.    Cassaday having an appointment to see the Neurosurgery department, again he took an EOS scan for scoliosis, the imaging was again not read to the full extent of what Cassaday lives with.

143.    Upon examination, Cassaday was taken to a really small room, asked to walk, in which he could only take one to two steps, the

doctor was pausing for long times after each time, & the floor was uneven.

144.    No results or care came from these appointments.

**MATTER #5 – MI Bureau of Professional Licensing**

1. Cassaday through this time filed complaints with the Bureau of Professional Licensing (MI BPL) in regard to the adverse conduct & environments he had experienced.

2. The agency doesn't want any evidence in which they ignore the truth & it is assumed they ask the doctors or licensees their side, & always take their side over the reality of the patient & what they felt or endured.

3. This is the exact system that Larry Nassar exploited here in MI to abuse & sexually assault little girls for years on end.

## MATTER #6 – MI BAR ASSOCIATION

1. Cassaday sought legal help numerous times over the years to no avail.

2. The system in place & indoctrination keeps these individuals from standing up to the abuse, especially under Corpus Juris Secundum §4.

3. The MI Bar again takes & ignores the reality of the people & it is being used as a form of protection for some, & a form of getting rid of anyone who stands up to the abusive & corrupt systems built in MI.

**MATTER #7 – Eaton County Sheriffs**

1. Cassaday started to reach out to local authorities in Eaton County Sheriffs office, & prosecutors, to no avail.

2. One point that will come into play later again is Mark Wrigglesworth sent an email to Cassaday stating that "the proper place to make threats is the Ingham County Sheriff's, his brother.

**MATTER #8 – MI Courts**

1. Cassaday trying to exhaust all his grievances as required by law, by paper, & supplying it to authorities the proper way with no help shows there is a real failure here in the State of MI.

2. Cassaday reaching out to his local Rep. Sarah Anthony, & her response was along the lines her only focus is on education in MI.

3. Cassaday reaching out to the US Senator Gary Peters., to no avial.

4. Cassaday started sharing with the US FBI in 2019 due to the relentless conduct Cassaday was enduring & told them to "pay attention."

5. Cassaday's emails between his mother & him being infiltrated, font changing halfway through, Cassaday thought it was his mother doing it, but she said she did nothing, & it looked normal on her end.

6. Cassaday, waited as his mother was dying, after death, he went in to see the email from his mothers side, it was normal, she did nothing.

7. Cassaday tried to share these events with the FBI, but their IC3 reporting does not allow the font to transfer, only the context, so their systems are obstructive in nature to keep the truth from seeing the light of day.

8. Cassaday also started to share with the MI AGs office in 2019 the constant adverse events he faced, just to have a third party, not involved & to document the events.

9. After all this failed, Cassaday started to file in the MI COC on 3-11-2021, filing 23 cases, & yes some were 100% wrong jurisdiction, but unknown to Cassaday at the time, he was actually following the law under 18 USC §4 & since no law enforcement in MI would do their part due to Cassaday either being,

    a. Native Indian

    b. Criminal History

    c. Age

    d. Sex

    e. Etc.

10. Mr. Cassaday was paying for the court fees to start, as he was unaware of IFP status or motions, he had one goal to share the truth with the courts, Cassaday spending upwards of $6607.85.

11. Once Cassaday realized he didn't have to pay, he started to file for IFP status, in which coincided with the courts blocking his access in any non-criminal matter.

12. Cassaday was fined $500. for being a vexatious litigator.

13. Cassaday admits, he was struggling, the abuse by more than 10 individuals is hard for anyone to endure, then in actuality multiply that # by two or 5

times, maybe upwards of a 100 or more individuals failed, retaliated,

harassed or hindered Cassaday's life.

14. The blocking of Cassaday's access to the courts did cause duress, it is the 1st

US Constitutional Amendment, the basic unalienable bill of rights that is not

to take place.

15. Cassaday, saying things about the clerk of court, that were construed as

threats.

16. Cassaday continued to try & live his life as he is supposed to have a right to

under 25 USC §185.

**OTHER MATTERS #9 - Various**

17. Cassaday having other events that are to many extents frivolous, but did cause other mental anguish such as,

    a. Pick up orders at Taco Bell, the restaurant locking the doors, & when Cassaday & his spouse attempted to go through the drivethrough the teller said they had no order, & Cassaday must be confused, Cassaday paying for this food, with no service or product, Cassaday chose to leave as the conduct was in attempt to cause an interaction with law enforcement.

    b. Cassaday receiving unpurchased items from Amazon, a Bow & Arrow target called the "Black Hole," & life vest.

    c. The app used to record calls was tampered with, & today those four calls made with Lansing Radiology are the only ones of importance that are unplayable. Showing possible attempts to destroy evidence of those conversations Cassaday had in his defense.

    d. AT&T making calls daily, robocalls in which Cassaday sent a cease & desist letter to, they responded & said give them some specified time frame, in which the conduct did continue even after.

e.  Cassaday contacting Verizon as that was who his phone service was through, being threatened that if he continues to press the issues in relation to the emails being changed there would be ramifications.

f.  When Cassaday did come forward & seek accountability, he was retaliated against by Verizon, by removing his access to being a manager on the account, sending a letter to his spouse in attempt to control a false narrative & fearmonger her, which worked.

g.  At one point, Cassaday had stocks with Merril Lynch, in which he used the app to watch the market, he noticed during one period that if he looked away from the phone he would be logged out of the account. Cassaday was in disbelief as he did not give any such app permissions to use his camera, but it was clearly doing this, & he reached out to the company in regards to their eavesdropping.

h.  Cassaday's account with Fidelity, supposedly being he had less than $800. his account in the end was closed, during his time incarcerated to which it is still unknown if the check was ever cashed, losing money.

i.  A wireless phone charger, Anker, was turning on the location services during the night, overriding user settings & it is alleged that this again is eavesdropping, syphoning data & locations on US Citizens.

j.  One evening while in Lansing, at Mr. Cassaday's home there was a

knock on the front door, when he turned the interior lights off, & went

to the window nobody was there.

This event led to police arriving & walking up the road, Cassaday told

his wife he should call authorities, in which she belittled & berated

him, but Cassaday went out & seen the footprints in the dirt by the

front door, one car then did come down the cul-de-sac, Cassaday told

the officer that someone knocked on his door, & that he didn't call it

in, the officer had the patrol car at the end of the road pull over this

vehicle, unknown outcome or when, 2017 or maybe 2018.

k.  After the events with Sparrow Health, an individual came to our door

one day, like fake crying about Sparrow not giving her her records &

asked for money, Kelli, Kevin's Spouse talked with the individual, &

they gave her twice as much as she asked for.

l.  These events are not it, there is more all throughout the years that it is

believed was geared towards harassing Mr. Cassaday, in attempt to

cause duress & obstruct justice.

**MATTER #10 – MI Cannabis Regulatory Agency, Frmly. MI MRA**

1. As Cassaday stated above, he switched to Medical Marijuana around 2015.

2. When he moved to Lansing, he started to make purchases for his preferred medicine at local dispensaries, even going to Jackson, MI.

3. When Recreational Marijuana was approved in 2018, the State of MI & its actors, plus numerous others engaged in a criminal conspiracy against the people, the voters of MI, it is alleged that it stems from the right wing in politics, & it is extremely concerning to just how bad the conduct was & goals in the end to overthrow the voters of MI by lobby businesses & people embedding themselves in government in attempt to influence policy & or their pocketbooks with no regards to the safety & life of humans.

4. When the Recreational passed, the State of MI created a two shelf system.

5. One shelf had Recreational & one had Medical.

6. During the 2019 – 2020 timeframe, product Cassaday was purchasing was tainted & lacking in quality.

7. The MI LARA created a form to blackmail anyone making purchases to waive their rights to seek remedy for being systematically poisoned.

8. Mr. Cassaday noticed what was going on, he spoke up to the MI Marijuana Regulatory Agency Dir. Andrew Brisbo & inspections Former State Trooper Joseph Thomas.

9. Brisbo would not respond to any communications.

10. Cassaday got responses from Thomas, telling him to basically buzz off & any further communications would go unanswered.

11. The links of this conspiracy are fairly straightforward but layered & strategic to cover up the abuses the citizens have & are possibly still enduring.

12. Much of the marijuana products initially tainted by too much boosters being fed to the plant, fertilizers, & not properly flushing the plant before harvest, among other things like dust mites & etc.

13. Products that didn't pass quality were being placed on Medical shelves, as the products being purchased on the Recreational side could leave the State of MI boundaries, the right wing learned from the Flint Water Scandal, as a doctor in Ohio, Indian, Illinois, Wisconsin & etc. could perform bloodwork on any person & report high levels of arsenic, chromium, lead & etc. & foil their plans to maximize profits.

14. These individuals could not have this as they could stand to lose big amounts of money.

15. Some facilities were actually taking products off the shelves before Mr. Cassaday could go back to make his selections, in which after reporting could have resulted in closure of the storefront.

16. Cassaday being a Medical Patient is not subject to excise tax, but he was being charged such taxes without representation, in violation of MCL §333.27963(4)(b)(c).

17. It is alleged there was a conspiracy from top to bottom to embezzle this income & not report it to the state, by more than one individual.

18. Cassaday calling police to report the conduct numerous times was met with officers running protections for the businesses.

    Under the Ingham County

    a. 9-16-2021 Incident #21-0147870

    b. 9-17-2021 Incident # 21-0158676

19. On 10-15-2021 Cassaday tried 8 times to relay to authorities the conduct he was enduring, dispatch kept hanging up on Mr. Cassaday, ignoring calls & just letting the phone ring.

20. As Cassaday continued to report these events, he again was met with retaliation, intimidation & a concerted effort to obstruct justice by painting a false light & image of Mr. Cassaday in attempt to silence him.

21. Cassaday being banned from one store due to their bait & switching.

22. Cassaday going to another store, same company, to again be met with adverse events.

23. Cassaday would order his product online, then go to the store to pick up his product.

24. You pull into a numbered spot when you arrive at the store, a 'runner' would come out to the vehicle, take your IDs & money & go into the store & complete the purchase, then this runner would return with your product & you are good to go.

25. One purchase after the previous events again was bait & switching.

26. Then on or around the time in 10-2021 Cassaday made purchases, arrived at the store, the runner went in & returned to tell Mr. Cassaday that "we don't have your order, you must be confused about where you are or made your purchase."

27. Cassaday pulling out his phone & pressing record, he recorded the event, asking "where am I then?"

28. The runner stated the address.

29. Cassaday saying, "ok if I made my purchase at such said store, shouldn't my purchase be here?"

30. Runner, oh yeah, I'll go check, so the runner goes in then returns with the product, Cassaday goes home.

31. Cassaday again roughly a week later returned to the same store with another purchase, in which the exact same scenario happened with another 'runner.'

32. Cassaday recording the events again, believed to be store manager returned & gave Cassaday his product, & being told that his is banned form all stores.

33. Cassaday maybe asking "for what?"

34. The manager saying "because you recorded my employee."

35. Cassaday said "call the cops then."

36. The store manager laughed & said "that is not going to happen."

37. Leading into these events, Cassaday was reaching out to the Ingham County Sheriff Scott Wrigglesworth, to no avail, before these visits & after, with no response.

38. Cassaday at one point again saying things that pushed the limits, but in actuality he was directed by Scott Wrigglesworth's brother Mark Wrigglesworth that "the proper place to make threats was the Ingham County Sheriffs."

39. The Sheriff of Ingham County ignored all pleas for help, as he is biased & prejudice to marijuana, begetting abuse within the state in attempt to run a prohibition on the marijuana industry, Sheriff Wrigglesworth willfully neglected to investigate or handle the matters of the people enduring abuse that falls within his jurisdiction.

40. Mr. Cassaday attempted in 2021 to file suit against these individuals that were in charge of oversight, to no avail, only to be blocked from the courts

& continued attempts to obstruct justice & keep Cassaday from speaking up or being heard.

41. After this last event, Cassaday drove to the MI State Police Post, believed to be again 10-15-2021 the post was about two miles from his home, also part of the main MI Trooper training & main office under the State of MI, to share these videos with authorities.

42. Cassaday walking in, introducing himself & starting to play the videos for an officer, the officer then stating, "I don't want to see that," & waving his hands to put it away.

43. One time, maybe multiple, but one time stands out the most as Cassaday made a purchase in Jackson, MI. He drove down there, purchased his product & on return driving up 127 there was numerous MI State Police lined up in the medians as a show of force, more than one.

44. When Medical Patients make purchases it is recorded in the state system, the MRA & or its employees can see possibly almost instantaneously when purchases are made.

45. It is alleged Mr. Thomas & or others were using their old connections at the MI State Police in attempt to intimidate & retaliate against Mr. Cassaday for noticing & speaking up to the abuse riddled throughout MI.

**MATTER #11 – Hawks / Luebs**

46. Former Dir. of MI LARA was Orlene Hawks, MI LARA is the oversight of the then MI MRA, now the MI CRA.

47. The Dir.'s husband is Mike Hawks who owns a lobby business in the State of MI, in which it is alleged he had a hand in manufacturing marijuana in the State of MI.

48. It is alleged the combination of the two, was used as a weaponization of governmental agencies to cover up their crimes & continued abuse to the citizens of MI.

49. This recipe could squash competition in the marijuana market, it could steer inspections away from their own businesses & so much more, it is believed this was a concerted effort by numerous unknown individuals at all levels of society.

50. Mr. Cassaday having troubles with he MI BPL, MI LARA & etc. sent a letter of cease & desist to both Hawks, Orlene at LARA & Mike at his company of GCSI.

51. In response to this, these two sent a Sergent William Luebs to Mr. Cassaday's home, stating "he has the cease & desists."

52. Mr. Luebs was a MI State Trooper.

53. Mr. Luebs went into questioning Mr. Cassaday, as they were out on the lawn near the driveway & house.

54. Cassaday's spouse was home during this time, but unaware of what was going on or being said supposedly.

55. The questioning went close to this,

    a. Luebs "who is helping you?"

    b. Cassaday "what nobody"

    c. Luebs "who is helping you?"

    d. Cassaday "you are going to have to talk to the Attorney General."

    e. Luebs "is it Dana Nessel?"

    f. Cassaday "what no, you need to talk to the attorney general."

    g. Cassaday "you are muscling me."

    h. Luebs "if you contact either the Hawks again they will sue you for everything you have/own."

    i. Cassaday "you are threatening me."

56. Cassaday left to return to his home.

57. Luebs saying "have a nice day & departing."

58. It is believed that Luebs was on the phone with one or both of the Hawks at the time of this interaction.

59. Mr. Cassaday was threatened suit by MI employees & a lobbyist, showing a seriously deeply corrupt system in place & the government has been running around threatening anyone who speaks up to the abuses they or others endure.

60. It is alleged all these individuals & more were conspiring to overthrow the Medical platform in MI due to the excise tax loss.

61. The State of MI's employees & politics attempting to overthrow the voters does fall under 18 USC §2331(5).

62. The State of MI is committing RICO Act violations, & even still recently as Cassaday seen a recall on product dating back into 2024 in the Marijuana industry.

63. That again shows a systemic failure to ensure quality over profits.

64. Those products recently recalled in 8-2025 could be almost a year or more older, those products have been consumed already, those individuals who made those purchases just as Cassaday experienced can have adverse health effects.

65. The State of MI doctors were not doing blood work during this time in attempt to cover up any high levels of contaminates, it is across the board in MI a conspiracy to overthrow the voters, concerted on numerous levels in attempt to maybe even slander the left political party.

66. Mr. Cassaday had experienced extreme bleeding gums at one point, very lethargic & couldn't eat at times due to the contamination in the products he purchased.

67. These events again were covered up by the directors of the State agencies & others, the people have no representation in congress & the federal government has protected this conduct even after Cassaday has brought it to the courts as required under federal law.

68. Many of these individuals have left these departments, & the State of MI still allowing these individuals to be employed within the State Government, shows a complicity & begetting the conduct as there is no accountability.

69. The conduct is gross negligence on every level & every person that Cassaday reached out to & never got a report or inspection or the full story, even Cassaday reaching out to the US ATF as they would be the Federal agency that with federal legalization would fall under, nobody cares, showing a bias & prejudice to others & their own right to chose what works best for them in their health issues.

70. It is believed that some of these individuals use a face to the businesses they have, like the Hawks may not have their names directly on a deed or license but use others like an attorney Micah Siegal to run their business & agendas.

**MATTER #12 – MI Notice of Intent MCL §600.2912b Act 236 of 1961**

1. The MCL §600.2912b is unconstitutional.

2. It hinders access to the courts in violation of the 1st US Amendment & ultimately does obstruct justice, putting time in between the pressing matters of victims & delaying any stoppage of the abuse.

3. In this very instance of Cassaday being denied medical records, it allows those falsified records to fester in a person's life, in hopes that person doesn't make it out the other side of the delay in time of 182 days, but also the statue of limitations in the State of MI is limited to 1 year, in which erodes the time to file suit against the state, the MI COC does not file Notice of Intents to where the individual can follow on MiFILE, it is put on a shelf per se.

4. Many laws within the State of MI have been constructed to obstruct justice, & beget abuse by government agencies & or in this instance medical professionals.

5. These laws have been lobbied to protect abusive conduct, & again it was exploited by Larry Nassar who was convicted of sexually abusing numerous little children over multiple years, not coming to a stop until one of those little children herself become an attorney & was then given "credence" to what she endured due to a professional title over reality.

*600.2912b Action alleging medical malpractice; notice; mailing; notice period; statement; access to medical records; tacking successive notice periods; response; failure to receive response; health professional or facility not intending to settle.*

*Sec. 2912b.*

*(1) Except as otherwise provided in this section, a person shall not commence an action alleging medical malpractice against a health professional or health facility unless the person has given the health professional or health facility written notice under this section not less than 182 days before the action is commenced.*

*(2) The notice of intent to file a claim required under subsection (1) shall be mailed to the last known professional business address or residential address of the health professional or health facility who is the subject of the claim. Proof of the mailing constitutes prima facie evidence of compliance with this section. If no last known professional business or residential address can reasonably be ascertained, notice may be mailed to the health facility where the care that is the basis for the claim was rendered.*

*(3) The 182-day notice period required in subsection (1) is shortened to 91 days if all of the following conditions exist:*

*(a) The claimant has previously filed the 182-day notice required in subsection (1) against other health professionals or health facilities involved in the claim.*

*(b) The 182-day notice period has expired as to the health professionals or health facilities described in subdivision (a).*

*(c) The claimant has filed a complaint and commenced an action alleging medical malpractice against 1 or more of the health professionals or health facilities described in subdivision (a).*

*(d) The claimant did not identify, and could not reasonably have identified a health professional or health facility to which notice must be sent under subsection (1) as a potential party to the action before filing the complaint.*

*(4) The notice given to a health professional or health facility under this section shall contain a statement of at least all of the following:*

(a) The factual basis for the claim.

(b) The applicable standard of practice or care alleged by the claimant.

(c) The manner in which it is claimed that the applicable standard of practice or care was breached by the health professional or health facility.

(d) The alleged action that should have been taken to achieve compliance with the alleged standard of practice or care.

(e) The manner in which it is alleged the breach of the standard of practice or care was the proximate cause of the injury claimed in the notice.

(f) The names of all health professionals and health facilities the claimant is notifying under this section in relation to the claim.

(5) Within 56 days after giving notice under this section, the claimant shall allow the health professional or health facility receiving the notice access to all of the medical records related to the claim that are in the claimant's control, and shall furnish releases for any medical records related to the claim that are not in the claimant's control, but of which the claimant has knowledge. Subject to section 6013(9), within 56 days after receipt of notice under this section, the health professional or health facility shall allow the claimant access to all medical records related to the claim that are in the control of the health professional or health facility. This subsection does not restrict a health professional or health facility receiving notice under this section from communicating with other health professionals or health facilities and acquiring medical records as permitted in section 2912f. This subsection does not restrict a patient's right of access to his or her medical records under any other provision of law.

(6) After the initial notice is given to a health professional or health facility under this section, the tacking or addition of successive 182-day periods is not allowed, irrespective of how many additional notices are subsequently filed for that claim and irrespective of the number of health professionals or health facilities notified.

(7) Within 154 days after receipt of notice under this section, the health professional or health facility against whom the claim is made shall furnish to the claimant or his or her authorized representative a written response that contains a statement of each of the following:

(a) The factual basis for the defense to the claim.

*(b) The standard of practice or care that the health professional or health facility claims to be applicable to the action and that the health professional or health facility complied with that standard.*

*(c) The manner in which it is claimed by the health professional or health facility that there was compliance with the applicable standard of practice or care.*

*(d) The manner in which the health professional or health facility contends that the alleged negligence of the health professional or health facility was not the proximate cause of the claimant's alleged injury or alleged damage.*

*(8) If the claimant does not receive the written response required under subsection (7) within the required 154-day time period, the claimant may commence an action alleging medical malpractice upon the expiration of the 154-day period.*

*(9) If at any time during the applicable notice period under this section a health professional or health facility receiving notice under this section informs the claimant in writing that the health professional or health facility does not intend to settle the claim within the applicable notice period, the claimant may commence an action alleging medical malpractice against the health professional or health facility, so long as the claim is not barred by the statute of limitations.*

**Matter #13 – Divorce / 56th Eaton Circuit Court**

1. Mr. Cassaday filed for divorce on 9-23-2021 in the Eaton County 56th Circuit Court due to his spouse's infidelity, which happened around on the night of 7-18-2019.

2. Ms. Brozanski is employed in the Michigan Department of Education.

3. Ms. Brozanski was on a taxpayer-funded trip, using taxpayers' money for sexual pleasure.

4. The events above led to Kelli's distrust in Mr. Cassaday, this is a tactic by criminals, to isolate & destroy victims support system, to create a false light & create the illusion that their victim is the problem.

5. Ms. Brozanski would berate & belittle Mr. Cassaday constantly of all the above events, to protect professions over others, her spouses, reality; it shows a serious problem of indoctrination on all levels in this country.

6. The Circuit Courts failed to drill down the facts, Ms. Brozanski hiding & retaining assets, & perjuring herself before the courts.

7. Mr. Cassaday gave up, he was arrested on 10-27-2021 till 5-6-2024 due to the things he said, no actual conduct, will or intent to incite like he witnessed with others 1:23-cr-00043-LJM USA v. Cassaday WDMI USDC, 18 USC §1512(d)(4)

**MATTER #14 – Blue Cross Blue Shield**

1. Blue Cross Blue Shield (BCBS) was the insurance company the Cassaday's had.

2. BCBS engaged in conduct to obstruct Mr. Cassaday's access to healthcare, by denying payments to various doctors, calling doctors (Dr. Menagi).

3. BCBS is a non-profit organization in the State of Michigan, the CEO Daniel Loepp has used that exemption to drive up prices & pad his pockets with funds to be used in the medical care of their clients.

4. Danial Loepp has systematically driven up costs, to businesses & it is alleged he was making almost $100,000,000.00 per year.

5. Non-profits, just skim off any extra money at the end of their year & pay it out to board members through bonuses, so they can show the government a flat, no income balance at the end of their year.

6. This organization is committing RICO Act violations, bleeding money off the people backs by denial of services.

## **CONCLUSION:**

1. The above matters should not limit the scope of this complaint or suit in equity.

2. Mr. Cassaday retains the right to amend, modify, add or delete individuals or context to their actual conduct upon discovery.

3. Mr. Cassaday tried to come forward numerous times, more than 60 times, he would fall under 18 USC §1514A due to the complaints he filed in 2013, in which he was subjected to strategic & systematic retaliation, intimidation & constant harassment over many years.

4. The medical field in MI has been waging war on Cassaday & his ailments to keep him from getting help, obstructing justice that is still active in his medical records & would wash any affirmative defense on statute of limitations.

5. The defendants know the system works for them, they have no respect to the rule of law or any acceptance of responsibility as shown on numerous occasions, or how other individuals will gang up to bully & intimidate another person for their colleagues or friend's actual conduct; protecting professions over reality.

6. The above conduct is over the top, it is pure abuse & would constitute an uncivil, civil war being ran on Mr. Cassaday.

7. Upon prima facie this court has enough grounds to proceed, not mere allegations, actual conduct existed by the defendants to ruin Mr. Cassaday's life, marriage & family.

8. This suit is in equity for the threats made to Mr. Cassaday, intentional tort by his employer, torts from obstruction of justice causing duress & a criminal prosecution against Mr. Cassaday for their intentional & purposeful conduct.

9. The defendants all pose a threat to continued criminal conduct.

10. The State of MI has been harboring fugitives & begetting criminal conduct, against one select race, the people of MI, workers, & etc.

**RELIEF REQUESTED:**

1. Accountability.

2. The courts can appoint a special master to investigate, collect evidence, take testimony for the courts or any other writs or motions that would speed along adjudication of this matter, on its own authority or accord.

3. For all government employees, the amount requested will be their salary from the time of first contact added up & multiplied by three-fold.

4. Reasonable attorney fees for a pro per litigant, equal to as if he was an attorney to be paid for by all defendants, consecutively.

5. If any funds are recovered, those funds are to be collected by the clerk of court, the clerk of court can deduct any fees & costs incurred, any remaining balance to be then disbursed to Mr. Cassaday.

6. Specifically, the Hawks & Trooper William Luebs threatened suit for everything Mr. Cassaday has/owns, this suit is for everything those three specifically have/own.

7. The amount as a whole is in excess of $75,000, to be determined by the income of those individuals ever since the start of their adverse conduct to current time.

8. It is believed that some individuals did divest funds or assets in anticipation of this suit being brought.

**AFFIDAVIT:**

These documents are true & correct under penalty of perjury.

*Kevin Cassaday*        8-18-2025

Kevin Cassaday

4819 N. Stark Rd.

Hope, MI 48628

kwcassaday@yahoo.com

989-615-7096

JS 44 (Rev. 03/24)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

### I. (a) PLAINTIFFS

KEVIN WILLIAM CASSADAY ~ PRO PER

### DEFENDANTS

STATE OF MICHIGAN, et al

**(b)** County of Residence of First Listed Plaintiff   MIDLAND
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   INGHAM
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

4819 N. STARK RD
HOPE, MI 48628      989-615-7096

Attorneys *(If Known)*

MICHIGAN ATTORNEY GENERAL

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [x] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [x] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**CIVIL RIGHTS**
- [x] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

Other:
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

### V. ORIGIN *(Place an "X" in One Box Only)*

- [ ] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [x] 8 Multidistrict Litigation - Direct File

### VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
1ST US AMENDMENT; 42 USC 1981 & 1983

Brief description of cause:
RETALIATION, INTIMIDATION, OBSTRUCTION OF JUSTICE, MENTAL ANGUISH, CLAIM FOR TORTS

### VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $   75,000+

CHECK YES only if demanded in complaint:
JURY DEMAND:   [x] Yes   [ ] No

### VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE   MURPHY; MORRIS    DOCKET NUMBER   25-cv-10419 WDMI USDC

DATE
8-18-2025

SIGNATURE OF ATTORNEY OF RECORD
*Kevin Cassaday*

### FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____